# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2556

_____

Sally Higgins,

        Plaintiff -Appellant,

v.

Alberto Gonzales, Attorney General
of the United States of America,

        Defendant - Appellee.

Appeal from the United States
District Court for the
District of South Dakota.

_____

Submitted: December 15, 2006
Filed: March 20, 2007

_____

Before BYE, COLLOTON, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

Sally Higgins, a Native American, was employed by the District of South Dakota (DSD) as an Assistant United States Attorney (AUSA). After her resignation, Higgins brought an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e - 2000e-17 (Title VII) alleging racial discrimination and retaliation. The district court[1] granted summary judgment on both claims finding Higgins failed to

_____

[1]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

establish a prima facie case under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1972). We affirm.

I

Higgins is an enrolled member of the Oglala Sioux Tribe. In July 1999, she began a two-year term AUSA position[2] in the United States Attorney (USA) office in Rapid City, South Dakota. At the time, the Rapid City office employed five AUSAs in addition to Higgins—Jeannine Huber, Gregg Peterman, Diana Ryan, Mary Thorstensen, and Mark Vargo—as well as Deputy USA Mara Kohn. Higgins was the only Native American AUSA in the Rapid City office and was one of three Native American employees in the state. Her duties were split evenly between the CIRCLE Project[3] and prosecuting criminal cases. She alleges her direct supervisor, Kohn, discriminated against her based on race and thereafter retaliated against her for complaining about such discrimination.

During her two-year term, Higgins alleges Kohn made several comments about Native Americans either in her presence or within her earshot. Specifically, in March 2000, during the trial of tribal members for misspending monies, she contends Kohn asked in her presence: "Aren't there any honest Indians anywhere?" Higgins and another Native American employee, Barbara Dull Knife, informally complained to Ryan, the Equal Employment Opportunity (EEO) contact person in the Rapid City office. Over a year later, Higgins reported this statement to Interim USA Michelle

---

[2]Higgins's position was always a two-year term position. She was informed at the outset of her term it would expire in August 2001 and she would have to apply for a new position in order to continue working for the DSD. Nevertheless she did not apply for another position with the DSD.

[3]The Comprehensive Indian Resources for Community and Law Enforcement (CIRCLE) Project was a Department of Justice initiative designed to enhance tribal justice systems.

Tapken, shortly after Tapken became Interim USA. Tapken testified she did not investigate EEO policies or advise Higgins to lodge a complaint as she believed too much time had passed. She did confront Kohn about the allegation and asked her to submit a written response. In her response, Kohn denied making the statement. In addition to the "honest Indians" comment, Higgins claims Kohn asked "doesn't anybody work down there?" when trying to call the Department of Public Safety for the Oglala Sioux Tribe and asked "don't they have any cars down there?" referring to the reservation. When Higgins's term was about to expire, she claims Kohn stated: "Your time is almost up. I wouldn't want to be in your shoes." Higgins construed this to mean Kohn felt sorry for her because she assumed Higgins would go to work on the reservation. Finally, she contends Kohn talked with her about two Native American witnesses, stating if they wanted to buy alcohol they would "find a way," and she could get them arrested if they failed to comply with their subpoenas.

Throughout her two-year term, Higgins alleges Kohn failed to provide her with appropriate mentoring, supervision or training, thus "setting her up to fail" as an AUSA. She claims Kohn had an obligation to show her the ropes when she was first hired. She also claims Kohn was nicer to Huber, a new Caucasian AUSA, and provided her with more mentoring and assistance. There was no formal mentoring system in place in the DSD during Higgins's tenure. The record reflects at least some AUSAs believed Kohn did not provide Higgins with appropriate supervision given her lack of trial experience. Peterman testified Higgins made some significant trial mistakes due to her inexperience, and Kohn did not provide her with appropriate support and training post these mistakes having occurred. He also testified, however, he worked with Higgins on these issues after being assigned as her mentor in August 2000. Ryan testified Kohn treated Higgins like a child and treated Huber with more respect. She also testified, however, Kohn treated all of the AUSAs "very badly" and "everybody said [Kohn] treats me like a child. Jeannine [Huber] said it, [Appellant] said it, Gregg [Peterman] said it. She treated everybody like they had no brain and no law degree and we could not function without her." (Appellee App. at 358). Vargo

-3-

testified Kohn was reluctant to supervise Higgins, but also that "Kohn's style as a supervisor was offensive to all of us" and she was condescending and criticized "whatever you had done." (Appellee App. at 382).

During her tenure, Higgins attended at least five training seminars. Although it is alleged she was denied the privilege of attending an appellate advocacy training seminar, she conceded during her deposition that when she requested permission, the course was not available. The next time it was offered, she was "busy with a trial or something." She did not request permission to attend the course the following year. In August 2000, after a year in her position, Higgins complained to an evaluation team about the lack of a formal mentor. In response, Kohn assigned Peterman to mentor Higgins. Although Peterman's evaluations of Higgins are in the record, and he testified about the mentoring relationship, Higgins testified she was never informed he was her mentor but was simply told by Kohn she was to go to Peterman with questions. Peterman evaluated Higgins's performance in June 2001 in a memo to Tapken. He indicated Higgins was a "very slow learner" with regards to trial practice and procedure and she was not ready to prosecute serious offenses. He did note she had done an adequate job prosecuting juveniles and lower level felonies. He noted: "She will also need to work overtime hours if she wants to attain the level of competency necessary."

Higgins assembled a reasonably good trial record. She handled twenty-five criminal cases during her term, obtaining twenty-one guilty pleas, two convictions in three jury trials, and tried a bench trial which resulted in an acquittal. In 1999 and 2000, she received formal performance evaluations by Kohn which indicated her performance in all categories "meets to exceeds expectations." Higgins argues she was denied a mid-year review in 2001 which affected her pay raise and promotion opportunities. In South Dakota, however, salary increases are determined according to the Administratively Determined Pay Plan under which AUSAs are eligible for pay increases based on their annual reviews rather than their mid-year reviews. Higgins

also contends she was denied an annual review in 2001, though such a review would not have been due until early in 2002 and she resigned in October 2001. When Higgins was hired, she was classified as a Grade 25 based on her five years of experience. With locality pay, her salary was $55,052. During her tenure, she received the same cost-of-living pay raises as the other AUSAs and additionally received a promotion from Grade 25 to Grade 27, increasing her total salary to $62,885—a raise substantially greater than the raise given to the other AUSA ranked as "meets to exceeds expectations" during the annual cycle.

During her term in the Rapid City office, Higgins claims Kohn kept a "shadow file" on her where she documented Higgins's progress and kept copies of her draft work product. Kohn testified she kept notebooks and draft work product for each AUSA. There is some evidence in the record of Kohn having "stepped up" her documentation of Higgins after she learned Higgins told Peterman about the "honest Indians" comment and told employees in the Pierre office as to Kohn being a racist. Higgins also claims Kohn "papered" her file with complaints. Specifically, she notes Kohn reported to then-USA Ted McBride about both: 1) an alleged racially discriminatory remark Higgins made about white people, and 2) Higgins's alleged leak of confidential information in a drug case. In addition, Kohn sent a memo to Tapken (at her request) denying she made the "honest Indians" statement. Higgins's file also contains two memos to Kohn drafted by Peterman regarding complaints lodged against Higgins by a magistrate judge as to her trial performance.

Higgins contends Kohn specifically kept track of when she came in and left the office. Other AUSAs testified Kohn had the receptionist keep track of everyone's whereabouts. Finally, Higgins claims Kohn made demeaning comments about her performance. She contends Kohn's comments impacted her career potential in the new term position she was seeking in the Pierre office, discussed below, because her new supervisor, Deputy USA David Zuercher, was poisoned by Kohn's characterization of Higgins's work. Zuercher testified he was familiar with Higgins's

Rapid City work through his discussions with other AUSAs and Kohn and was reluctant to have her work for him because of concerns about her skills and the judicial complaints made about her. After she was hired in Pierre, however, Zuercher assigned her a mentor and testified he was "terribly surprised" when she resigned. In addition, Higgins's new mentor, Randy Seiler, testified positively about her performance after she began her term in Pierre.

Higgins's term position was set to expire on August 17, 2001, and, because Congress cancelled additional funding for the CIRCLE Project, her specific position could not be renewed. In June 2001, the Justice Department Executive Offices announced a hiring freeze for any district not having a permanent USA. The DSD was impacted by the hiring freeze, as it did not have a permanent USA then, but rather an Interim USA—Tapken. In spite of the hiring freeze, Tapken sought and obtained permission to offer Higgins a new two-year term AUSA position in Pierre, South Dakota, starting in August 2001. Tapken testified she conducted a need-study of the USA offices in South Dakota to determine where the position would be located. Higgins alleges Kohn recommended Tapken "terminate" Higgins. There is no evidence in the record to support this allegation.[4] Higgins accepted the Pierre term position on August 15, 2001. She did not experience a change in salary or benefits, and her new position consisted exclusively of prosecuting cases. Shortly after her move to Pierre, Higgins filed a discrimination complaint with the EEOC. On October 20, 2001, she resigned and accepted a higher paying position with the U.S. Department of the Interior in New Mexico.

---

[4]Ryan testified Tapken stated it might be easier if she let Higgins's term expire. The only evidence in the record which might support the allegation that Kohn recommended Higgins's termination is Kohn's testimony she called someone in administration—Paul Ross—to ask about the procedure she should follow when a term position expires because "[n]obody knew in [the Rapid City] office because it had never happened before."

II

We review the district court's grant of summary judgment de novo, affirming only if there is no genuine issue of material fact and the government is entitled to judgment as a matter of law. Wallace v. Sparks Health Sys., 415 F.3d 853, 858 (8th Cir. 2005). In reviewing the evidence, we draw all reasonable inferences in favor of Higgins, the non-moving party, id., and "[w]e are mindful summary judgment should seldom be utilized in employment cases." Stidham v. Minn. Mining & Mfg., Inc., 399 F.3d 935, 937-38 (8th Cir. 2005).

A

"Under the McDonnell Douglas framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden of production." Davis v. KARK-TV, Inc., 421 F.3d 699, 704 (8th Cir. 2005). To establish her prima facie case of racial discrimination, Higgins must show: 1) she is a member of a protected class; 2) she met her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees who were not members of the protected class were treated differently. Id. The district court found Higgins failed to show she suffered an adverse employment action and thus has not made out a prima facie case under the McDonnell Douglas burden-shifting framework. We agree.

"[An] adverse employment action must be one that produces a material employment disadvantage." Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999) (internal quotation marks omitted). "Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet the standard, as would circumstances amounting to a constructive discharge." Id. (internal citation omitted). Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially

significant disadvantage do not satisfy the prong.  Baucom v. Holiday Cos., 428 F.3d 764, 767 (8th Cir. 2005).

In support of her claim of racial discrimination, Higgins alleges several adverse employment actions by Kohn, claiming she: 1) was removed from a primary job duty on the CIRCLE Project; 2) was denied supervision, mentoring, and training; 3) was subjected to a shadow file and "whisper campaign" about her performance; 4) was formally complained about; 5) was not given an annual or mid-year progress review in 2001; 6) was recommended for termination by Kohn; and 7) was transferred to a different office with an unwilling supervisor.  She argues, even if these actions are insufficient when viewed separately, when taken together their cumulative force constitutes an adverse employment action.  We will consider each action in turn and thereafter evaluate the cumulative force of those actions.

Higgins first argues her removal from her CIRCLE project duties for a few weeks in early 2000 constitutes an adverse employment action.  This court has held, however, a job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient to establish an adverse employment action. See, e.g., Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (holding job reassignment involving "nothing more disruptive than a mere inconvenience or an alteration of job responsibilities," without any "diminution in . . . title, salary, or benefits" is insufficient to establish an adverse employment action).  The record shows McBride removed Higgins from her duties on the CIRCLE project for a few weeks in early 2000.  He testified he did so because of tribal tensions, and Higgins concedes tribal members were angry with her for reporting misuse of CIRCLE project funds. She does not allege her benefits or pay changed during this period and further admits she took leave to study for the bar exam during this time.  During this period she was still responsible for her prosecutorial duties.  She is not alleging she was given more or less desirable duties.  Like in Harlston, Higgins describes "nothing more disruptive

than a mere inconvenience or an alteration of job responsibilities." 37 F.3d at 382. As such, this does not constitute an adverse employment action.

Higgins next claims she was systematically denied supervision, mentoring and training so as to be "set up for failure" as an AUSA. Again, she makes no claim this denial led to a decrease in her pay or benefits or affected her future career prospects, thus this alone cannot constitute an adverse employment action. This alleged denial fails to qualify as an adverse employment action for a more fundamental reason, as she did not ultimately "fail" as evidenced by her new term AUSA position in Pierre. In spite of a few performance complaints, she had a good trial record and was given average ("meets to exceeds expectations") performance reviews. Furthermore, the record reflects she was assigned a mentor after complaining about a lack of assistance. Any lack of mentoring or supervision simply does not rise to the level of an adverse employment action, as she cannot establish the absence had any effect on her employment situation. As for the alleged denial of training, she argues as to being denied training which, by her assessment, "contribute[s] to promotion and pay increases." We have held "an employer's denial of an employee's request for more training is not, without more, an adverse employment action." Box v. Principi, 442 F.3d 692, 697 (8th Cir. 2006) (quoting Griffith v. Des Moines, 387 F.3d 733, 737 (8th Cir. 2004)). In Box, the plaintiff made only one request for additional training and actually received 200 hours of job training for her position. So too here, the record shows Higgins was never actually denied a training opportunity she requested. She testified as to not attending her desired appellate advocacy course because of scheduling difficulties. The record also shows she attended several other training seminars during her term. Although she makes the bald assertion of being denied training which would have contributed to promotion and pay increases, however, she fails to allege ever being denied a promotion or a raise because of a lack of training. During her twenty-six month tenure at the DSD, her pay increased by more than fourteen percent. As such, her alleged denial of training does not constitute an adverse employment action.

Higgins next contends Kohn kept a "shadow file" about her and started a "whisper campaign of demeaning comments about her performance." Kohn testified she kept files on all of the AUSAs and kept their draft pleadings if she thought they would be beneficial for evaluation purposes. The record does not reflect Higgins was singled out for bad treatment. Even if Higgins could show Kohn only kept a "shadow file" on her, she does not claim the notebook and alleged whisper campaign affected her pay or benefits. She attempts to tie Kohn's whisper campaign to Zuercher's reluctance to accept her in the Pierre office. There is evidence Zuercher was hesitant about Higgins because of discussions he had with employees in the Rapid City office, including Kohn, as to Higgins's trial skills and a magistrate judge's complaints. These were his feelings *prior to* her assuming the Pierre position. There is no evidence, as Higgins asserts, the "well was poisoned" at her new position. There is no evidence Zuercher would not supervise her or treated her poorly or differently in her new position. Zuercher testified he immediately assigned Higgins a mentor, and was surprised when she resigned. There is also no evidence, aside from her resignation to accept a higher paying position, that she was unhappy in her new position. Because Higgins does not establish she was, in any way, adversely affected by Kohn's record keeping and alleged "whisper campaign," this cannot constitute an adverse employment action.

Higgins next argues Kohn's various complaints about her constitute an adverse employment action. The record provides very limited information about these complaints. Even if there was evidence the complaints were false and retaliatory, Higgins does not allege they led to a material change in her employment status. The record shows no negative consequence to her because of these complaints. As such, they cannot constitute an adverse employment action.

Higgins also claims the DSD's failure to give her a mid-year and annual review in 2001 constitute an adverse employment action. In the DSD, annual progress reports were conducted either in January or February after the year reviewed; mid-year

reports appear to be conducted in June. Only the annual reports influence pay increases. It is true Higgins did not receive a mid-year report in June 2001. This was two months before her term was set to expire. This court has often held "[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005) (citation omitted). It logically follows that Higgins must show the absence of a mid-year evaluation led to a change in the terms and conditions of her employment. She has not made such a showing. In fact, two months after she was supposed to be evaluated, she was given a new position with the same pay and benefits in Pierre. She did not receive an annual report in 2001 because she resigned in October—approximately three months before such a review was due.

Higgins next claims Kohn recommended her termination and this qualifies as an adverse employment action. As noted above, the record does not support this allegation. Even if Kohn did make this recommendation, Higgins was not terminated. After her term expired, Higgins was offered the new term position in Pierre. As there was no resulting material change in Higgins's employment situation, this alleged recommendation cannot rise to the level of an adverse employment action.

Finally, Higgins argues her "transfer" to the Pierre office constitutes an adverse employment action. As an initial matter, technically she was not transferred. Her term expired and, in spite of a hiring freeze in place, Tapken sought and was granted permission to offer her a new term position. Should we accept Higgins's characterization of the new position being a transfer, she points to no evidence her title, salary and benefits changed or that her job responsibilities decreased.[5] See Turner, 421 F.3d at 697 (holding a transfer to a new city is not by itself an adverse employment action where the plaintiff's title, salary and benefits are not affected, and

_____

[5]It is true Higgins's new position did not include work for the CIRCLE project, however, Congress (and not the DSD) was responsible for terminating the project.

the only adversity the plaintiff can claim are "normal inconveniences associated with any transfer" such as the necessity of "establishing one's professional connections in a new community"); Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005) (holding the plaintiff failed to raise a genuine issue of material fact where it was uncontested her pay and benefits remained the same after a change in job responsibilities); Meyers v. Neb. Health & Human Serv., 324 F.3d 655, 660 (8th Cir. 2003) (holding a significant change in working conditions occurs where there is "a considerable downward shift in skill level required to perform [the employee's] new job responsibilities"). In Turner, we ultimately found there was a genuine issue of material fact as to whether the work to which the plaintiff was assigned after her transfer was a considerable downward shift from her responsibilities prior to the transfer. Turner, 421 F.3d at 697. Unlike in Turner, Higgins has failed to present sufficient evidence to raise a genuine issue of material fact as to whether her new position constitutes a demotion. She baldly asserts the Pierre position was "a demotion in substance if not in form" because Zuercher testified it was a "completely different position" and he was, prior to her transfer, hesitant about working with her. What is glaringly absent from her brief is reference to evidence in the record about her job duties in Pierre. The record shows her new position involved prosecuting criminal cases—the same work she was doing in Rapid City. She was immediately assigned a mentor who testified positively about her work. Higgins presents no evidence of being displeased by her workload in Pierre or that it represented a considerable downward shift from her responsibilities prior to the transfer. As such, her "transfer" cannot constitute an adverse employment action.

Higgins contends, even if the alleged actions do not individually constitute an adverse employment action, taken together they cumulatively rise to the level of an adverse employment action. She relies on Phillips v. Collings, 256 F.3d 843 (8th Cir. 2001) and Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997) for the proposition about actions short of termination or a decrease in pay or benefits still

-12-

constituting an adverse employment action.[6]  In both Phillips and Kim, we found an adverse employment action where the plaintiffs were not fired and did not suffer a change in pay or benefits.  Each of these cases presents a particularly extreme set of facts.  In Phillips, a supervisor prepared a four-page evaluation of the plaintiff in which she recommended termination specifically based, in part, on his religious beliefs.  After this negative evaluation was revised by others, the recommendation of "termination" was changed to "needs improvement."  In response, the supervisor drafted a new, fifty-three page evaluation criticizing "virtually every aspect of [the plaintiff's] job performance."  This evaluation contained an extensive "Corrective Action Plan" which included remedial training.  Phillips, 256 F.3d at 846.  We concluded this was tantamount to an adverse employment action, noting:

> Indeed the record clearly reveals that [the supervisor], who could not unilaterally terminate [the plaintiff], nor deny his transfer, did everything she could to disrupt his employment.  Had [her] corrective action plans been implemented they would signify a tangible change in [the plaintiff's] duties or working conditions that constitute a material disadvantage."

Id. at 849 (internal citations omitted).  Likewise, in Kim, immediately after complaining about age and race discrimination, after more than ten exemplary years with the company, the plaintiff was stripped of more desirable foreman duties, was given much lower performance evaluations, was orally warned about his poor "attitude," was placed under constant surveillance at work, was excluded from work meetings, was issued written reprimands for alleged race-based incidents, and was required to attend special retraining in spite of his seniority.  We found "[t]hese are the kind of serious employment consequences that adversely affected or undermined Kim's position, even if he was not discharged, demoted or suspended" and held, as

---

[6]Higgins also relies on Bassett v. Minneapolis, 211 F.3d 1097, 1105 (8th Cir. 2000).  In Bassett however, the adverse employment action prong was not at issue, as the plaintiff was terminated.

a matter of law, such systematic retaliatory conduct collectively constituted an adverse employment action. Kim, 123 F.3d at 1060.

In this case, the record does not show the level of systematic bad treatment adversely affecting Higgins's employment situation which is evident in Phillips and Kim. She was not forced into a remedial retraining program. The alleged "shadow file" apparently had no impact at all on her position, and did not impact her performance evaluations by which the DSD determined her pay. The record contains absolutely no evidence of a "poisoned well" in Pierre. Although there is evidence Zuercher had some hesitancy about supervising Higgins because of complaints about her job performance, there is no evidence these feelings continued after Higgins started working in the Pierre office. Although Kohn's treatment of Higgins was harsh and unprofessional, even cumulatively, the alleged adverse employment actions do not show a material employment disadvantage. Each of the claimed adverse employment actions falls far short of constituting an adverse employment action. Taking these actions together does not correct such insufficiency.

B

Higgins also contends the district court erred in holding she failed to establish an adverse employment action in her Title VII retaliation claim. Because the district court found her as not having established an adverse employment action in the context of her Title VII race discrimination claim, it assumed she had failed to establish this prong in her Title VII retaliation claim. Higgins argues, in light of the Supreme Court's recent broadening of the retaliation prima facie case in Burlington N. & Santa Fe Ry. Co. v. White, __ U.S. __, 126 S. Ct. 2405 (2006)[7], she established her prima facie case. We disagree.

---

[7]The Supreme Court rendered its decision in Burlington Northern subsequent to the district court's decision in this case.

As in a Title VII discrimination claim, in a retaliation claim the plaintiff bears the burden of establishing a prima facie case. After Burlington Northern, to establish such a claim, Higgins must show: 1) she engaged in protected conduct; 2) a reasonable employee would have found the challenged retaliatory action materially adverse; and 3) the materially adverse action was causally linked to the protected conduct. Burlington N., 126 S. Ct. at 2415; cf. Singletary v. Mo. Dept. of Corrs., 423 F.3d 886, 892 (8th Cir. 2005) (articulating old standard where, to satisfy the second prong, the plaintiff was required to show he suffered an adverse employment action).

Until recently, as part of their prima facie case, we required plaintiffs claiming unlawful retaliation under Title VII—like those claiming unlawful discrimination—to show an "adverse employment action" which produced a "material employment disadvantage" by cutting the employee's pay or benefits, depriving employment opportunities, or affecting future career prospects. Baucom, 428 F.3d at 767. As the standard in both types of Title VII actions was identical, if a plaintiff failed to establish the adverse employment action prong in the discrimination claim, we would automatically find failure to make out the prong in the retaliation claim. See id. at 768 (summarily dispensing with plaintiff's retaliation claim after finding he had failed to demonstrate an adverse employment action in his discrimination claim). In Burlington Northern, the Supreme Court announced a different standard for determining whether a plaintiff has established a retaliation prima facie case. Because "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm," a plaintiff need not show an adverse employment action related to the terms and conditions of employment. Id. at 2414. Instead, "the challenged action [must be] materially adverse, which in th[e] context [of a retaliation claim] means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citation and internal quotation marks omitted). The standard is thus objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory

actions. Id. at 2412-13. The Court explained the action against the plaintiff must still be "materially adverse" noting: "[w]e speak of material adversity because we believe it is important to separate significant from trivial harms," id. at 2415, and "Title VII . . . does not set forth 'a general civility code for the American workplace.'" Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). As such, certain behavior continues to be non-actionable under the retaliation provision such as "petty slights or minor annoyances that often take place at work and that all employees experience," "personality conflicts at work that generate antipathy," and "snubbing by supervisors and co-workers." Burlington N., 126 S. Ct. at 2415.

The Burlington Northern Court held there was sufficient evidence to support a jury verdict for retaliation where the plaintiff was reassigned to job duties which, although they fit within the same job description as a previous position, were "by all accounts more arduous and dirtier." Id. at 2417 (quotation marks omitted). Prior to her reassignment, she had been assigned to a forklift operator position which required more qualifications, was more prestigious, and was "objectively considered a better job." Id. The Court concluded a jury could reasonably conclude this reassignment of responsibilities would have been materially adverse to a reasonable employee. Id. The Court also found the plaintiff's thirty-seven day, investigatory suspension with backpay was materially adverse under the new standard. Id.

This is our first opportunity to address Burlington Northern, and apply the Court's reformulation of the retaliation prima facie case. Applying the new standard, we find Higgins has not met her burden. Unlike the plaintiff in Burlington Northern, she has not shown Kohn's retaliatory actions were materially adverse such that a reasonable employee in her situation would have been dissuaded from complaining about discrimination. In her briefs, she essentially confines the arguments to two alleged actions: Kohn's lack of mentoring and supervision and her "transfer" to Pierre. With regard to the mentoring and supervision claim, she contends "floundering should be recognized as an adverse employment action" and argues Kohn's behavior can be

-16-

compared to "the supervisor who pointedly excludes an employee from networking lunches." Kohn's lack of mentoring or supervision might constitute an adverse employment action under the new standard if Higgins could establish she was actually left to "flounder" or was negatively impacted by the lack of supervision or mentoring.[8] But she has not alleged, and the record does not support, such a claim. Although the record reflects she had a personality conflict with Kohn, there is nothing to suggest this conflict created a situation so unbearable or bleak that a reasonable employee would have been dissuaded from complaining about discrimination in such an environment.

As for the claim her "transfer" to the Pierre office was a materially adverse action, again it bears mention Higgins was not terminated from her position in Rapid City, nor was she actually transferred to Pierre; Higgins's two-year term position ended by the content of its terms. She was then, after considerable effort by Tapken, offered another two-year term AUSA position in Pierre, which she accepted. It is difficult to characterize this as an *adverse* action, let alone a materially adverse one. She does not allege the new position was qualitatively more difficult or less desirable than the one she held in Rapid City. As noted above, there is essentially no information in the record about her new position once she moved to the Pierre office. Zuercher testified he was surprised when Higgins resigned. Her mentor, Seiler, testified positively about her performance in Pierre. If anything, the record suggests her situation improved in Pierre. She argues the Pierre job "mandated [her] to leave her case files, start all over with [sic] different cases and move to a new school setting with her family." This court has, prior to Burlington Northern, found such arguments to be wanting. See Turner, 421 F.3d at 697 (holding, where the plaintiff argued a transfer required her to develop new contacts and start her career over, "[w]e are not persuaded as to the normal inconveniences associated with any transfer, such as

---

[8]It also bears mention that, even if Higgins could establish Kohn's actions were materially adverse, she does not allege a causal relationship between Kohn's lack of supervision and mentoring and Higgins's informal discrimination complaints.

-17-

establishing one's professional connections in a new community, are sufficient, without more, to demonstrate a significant change in working conditions"). <u>Burlington Northern</u> does not change this result. Under Higgins's logic, *any* move would qualify as a materially adverse action because it would force an employee to start over in a new city. We are unwilling to set such a definite line. Here, even if we were to accept the premise that her move was a retaliatory action—which we do not—we cannot conclude the move was materially adverse. There is no evidence her new duties were more difficult, less desirable or less prestigious. In this context, even given the inconvenience of a move, this action does not rise to the level of a materially adverse action.

Finally, Higgins points to Ryan's failure to bring a retaliation claim against Kohn as proof Ryan was dissuaded by Kohn's behavior towards Higgins. The standard under <u>Burlington Northern</u> is objective and asks us to consider what a reasonable employee would do in Higgins's shoes. She would like us to look at Ryan's failure to file a complaint against Kohn, and treat her as the proverbial "reasonable employee"—clearly if the EEO contact person would not file a claim, a reasonable employee would likely be dissuaded from filing a claim. We are unwilling to stray from the Supreme Court's objective standard. Furthermore, the record does not support Higgins's contention that Ryan was dissuaded from complaining because of Kohn's treatment of Higgins. Kohn was not Ryan's supervisor, as she was a civil specialist, rather than a criminal one. Therefore, Ryan was unlikely to be dissuaded by Kohn's negative treatment of Higgins because Kohn could not have similarly impacted her career with the DSD. Nevertheless, under <u>Burlington Northern</u>, we must look at Higgins's situation objectively to determine whether a reasonable employee in her shoes would be dissuaded from bringing a complaint. She cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs. It is clear she had a serious personality conflict with her supervisor. The record also shows Kohn was angry with her after she told others Kohn was a racist. What is absent from the record is evidence showing Kohn's anger and related actions materially and

adversely affected Higgins's life such that a reasonable employee in her shoes would be dissuaded from complaining.

## III

For the foregoing reasons, we affirm the district court.

_____