# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2065

_____

Monica Buboltz,

        Appellant,

    v.

Residential Advantages, Inc.,

        Appellee.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the District of
\* Minnesota.
\*
\*
\*
\*

_____

Submitted: January 14, 2008
Filed: April 18, 2008

_____

Before BYE, BEAM, GRUENDER, Circuit Judges.

_____

BEAM, Circuit Judge.

Monica Buboltz, who is legally blind, sued her former employer, Residential Advantages, Inc. (RAI), under state law, 42 U.S.C. § 12101 et seq. (the Americans with Disabilities Act or ADA), and 29 U.S.C. § 794 (section 504 of the Rehabilitation Act of 1973). RAI moved to dismiss Buboltz' complaint. The district court[1] granted the motion as to Buboltz' state law claims. RAI then moved for summary judgment

_____

[1]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

on Buboltz' federal claims, and the district court granted this motion. Buboltz now appeals only the district court's grant of summary judgment on her federal claims. We affirm.

## I.    BACKGROUND

RAI, a corporation that provides residential services to disabled individuals who cannot live independently or without supervision, hired Buboltz in 1999, as a direct service provider (DSP). As a DSP, Buboltz was responsible for providing service and support to meet the needs of the residents in RAI's homes.[2] Part and parcel of a DSPs responsibilities is providing transportation to the residents. When, however, RAI hired Buboltz, it knew that she was legally blind, and acknowledged, in writing, that the transportation requirement did not apply to Buboltz.

Buboltz worked at RAI for nearly five years without incident, other than minor problems, such as giving a disabled person his medicine three hours late. In 2005, however, officials at RAI became concerned with Buboltz' job performance. Specifically, Laure Verdoes, RAI's Lifestyle Specialist, whose job it was to assess the quality of RAI's services, and apparently, its compliance with government regulations, observed Buboltz doing the following: touching the crotch of a resident to see if the resident had urinated on herself; holding documents upside down during an attempt to read them; taking a long time to read; and failing to realize the presence of Verdoes, who was in the same office. Verdoes reported her observations and attendant concerns, which ultimately made their way to Sharon Leppla, Buboltz' supervisor. Leppla, however, disclaimed these observations, and stated she had no worries with Buboltz.

---

[2]RAI maintained a DSP job summary list that detailed seventeen essential functions of a DSP.

Despite Leppla's reassurances, approximately two months after Verdoes expressed her concerns, managers at RAI told Buboltz that she could no longer dispense medication or work alone with the residents. Upon learning of these restrictions, Buboltz requested a meeting to discuss RAI's concerns. At the meeting, Leppla stated that RAI made the changes to Buboltz' job because of concern that the licensing agencies may have a problem with her eyesight. Buboltz responded, "I have, like, numerous devices that I can use." RAI also told Buboltz that she was responsible for informing her co-DSPs of her new job restrictions. As a result of the job restrictions, other DSPs expressed frustration with Buboltz, causing her to feel stressed and anxious about her job.

After RAI reduced Buboltz' job requirements, it told Buboltz that she would have to work every other weekend, which she had never done since being hired in 1999. Buboltz was the only DSP who had not previously worked weekends. This change in scheduling initially increased Buboltz' hours; however, RAI later reduced Buboltz' hours when it stopped consistently scheduling her for weekday shifts.[3] Also, after RAI reduced Buboltz' job requirements, Leppla met with Buboltz and held a "performance discussion." This was the first such discussion in Buboltz' five-year history at RAI. The discussion resulted in a negative performance evaluation. Approximately one month after the performance discussion, Buboltz submitted a resignation letter, which became effective on August 1, 2005.

Four months after Buboltz' resignation, on December 29, 2005, after Buboltz obtained a right-to-sue letter from the Equal Employment Opportunity Commission, she filed suit against RAI in federal district court alleging disparate treatment and failure to accommodate claims. As to Buboltz' disparate treatment contentions, the district court concluded Buboltz failed to make out a prima facie case of

---

[3]Buboltz does not now argue on appeal that the later decrease in hours constituted an adverse employment action; therefore, we do not decide that issue.

-3-

discrimination because she failed to show she had suffered an adverse employment action. Anent Buboltz' failure to accommodate argument, the district court ruled that RAI satisfied its duty to make reasonable accommodations. Buboltz challenges both rulings.

## II. DISCUSSION

We review a district court's grant of summary judgment de novo. Cherry v. Ritenour Sch. Dist., 361 F.3d 474, 478 (8th Cir. 2004). In doing so, we apply the same standard as the district court, viewing the evidence in the light most favorable to the nonmoving party and giving that party the benefit of all inferences that may reasonably be drawn. Id. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### A. Buboltz' Disparate Treatment Claims

Buboltz asserts a disparate treatment claim under both the ADA and the Rehabilitation Act. Both the ADA and the Rehabilitation Act prohibit employers from discriminating against a disabled individual qualified for a job because of the disability of such individual. 42 U.S.C. § 12112(a); 29 U.S.C. § 794. Our cases interpreting these acts are interchangeable; accordingly, we apply the same analysis to both claims. Wojewski v. Rapid City Reg'l Hosp., Inc., 450 F.3d 338, 344 (8th Cir. 2006). To establish a prima facie case of disability discrimination, a plaintiff must show: (1) that she was disabled, (2) that she was qualified to do the essential job function with or without reasonable accommodation, and (3) that she suffered an adverse action due to her disability. EEOC v. Wal-Mart Stores, Inc., 477 F.3d 561, 568 (8th Cir. 2007).

Here, only the third prong of Buboltz' prima facie case–whether she suffered an adverse action–is at issue. Buboltz contends she did; RAI disagrees. Specifically, Buboltz argues that RAI took the following adverse actions against her: (1) it eliminated essential functions of her job, namely administering medicine and working alone with the residents; (2) it tripled her work hours; and (3) it constructively discharged her.

An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Thomas v. Corwin, 483 F.3d 516, 528 (8th Cir. 2007). Termination, cuts in pay or benefits, and changes that affect an employee's future career prospects are significant enough to meet this standard, as are circumstances amounting to a constructive discharge. Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007). Changes in intangible employment conditions may also constitute an adverse employment action. See Meyers v. Neb. Health & Human Servs., 324 F.3d 655, 660 (8th Cir. 2003). Nevertheless, "not everything that makes an employee unhappy is an actionable adverse action." Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (internal quotations omitted) (discussing an unlawful retaliation claim in the context of Title VII). For example, a job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient to establish an adverse employment action. Id. Additionally, minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy this prong. Higgins, 481 F.3d at 584; see also Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (holding job changes that amount to nothing more disruptive than a mere inconvenience or an alteration of job responsibilities are not adverse actions).

Buboltz' first contention, that RAI's decision to remove two of her essential functions constituted an adverse action, fails. RAI's decision to remove Buboltz' duty of administering medicine did not have a material disadvantage to Buboltz, as it

comprised little of her time and did not likely hamper her future at RAI.[4] RAI's decision to require Buboltz not to work alone with residents was also not an adverse action. Although Buboltz argues this restriction prohibited her from providing direct care to the residents, she fails to show what direct care she was precluded from providing. Indeed, Buboltz admits that this restriction was superfluous when the home was triple staffed, which it almost always was. Moreover, an alteration of job responsibilities, like the elimination of the duty to dispense medications or work alone with residents, does not constitute an adverse action. Harlston, 37 F.3d at 382. In sum, Buboltz' first contention fails.

Buboltz next argues that RAI's requirement that she work every other weekend, when RAI had not required her to do so over the past five years, constituted an adverse action. DSPs, as an essential function of their job, are required to "work hours . . . as required and scheduled." All the other DSPs at RAI worked scheduled weekends. Although Buboltz had not worked a weekend in her approximately five years at RAI, RAI lost two DSPs in the spring of 2005, necessitating Buboltz' (and all the other DSPs) weekend work. When RAI announced this change, Buboltz did not object on grounds that her disability precluded her from working weekends; rather, she only stated that this requirement did not apply to her. Buboltz, however, had no special contract with RAI waiving this essential function.[5] What is more, Buboltz has

_____

[4]Although the parties dispute the actual time it takes to dispense medications, their estimates vary, at most, by fifteen minutes. Thus, this dispute is immaterial and does not preclude summary judgment. What is more, given Buboltz' suggested time of thirty minutes to dispense medication, she spent, on average, no more than five percent of her time performing this task.

[5]The careful reader will recall that Buboltz did have a written agreement regarding the transportation requirement. Although Buboltz produced evidence that there was an oral understanding that she would not be scheduled to work weekends, she produced no evidence suggesting RAI was precluded from ever requiring her to do so.

yet to produce evidence that this policy change was linked to her blindness. In short, this policy change was not an adverse action, and even if it was, it is not "specifically linked" to discrimination, as RAI required all employees to work every other weekend. Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 990-91 (8th Cir. 2007) (holding that an adverse employment action is not sufficient alone, but there must also be a specific link between the adverse action and discrimination to prove that the discrimination motivated the action).

Buboltz also contends that RAI constructively discharged her, resulting in an adverse employment action. As stated above, a constructive discharge, just like any other discharge, is an adverse employment action. West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995). A constructive discharge occurs "when an employer deliberately renders [an] employee's working conditions intolerable," forcing him to quit his job. Id. (internal quotations omitted). An objective standard applies to constructive discharge claims, i.e., a constructive discharge takes place only when a reasonable person would find working conditions intolerable. Id. (holding "[a]n employee may not be unreasonably sensitive to [his] working conditions"). "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst and not to jump to conclusions too fast." Id. at 498.

In this case, Buboltz' constructive discharge claim fails because she failed to produce any evidence (direct or circumstantial) that RAI acted to deliberately render Buboltz' working conditions intolerable; rather, the evidence shows RAI acted in response to staffing changes and the work of a newly hired lifestyle specialist, whose job it was to assess the quality of RAI's services. Moreover, a reasonable person would not find the removal of two job functions, with no corresponding decline in pay or benefits, intolerable. Accordingly, Buboltz' claim fails.

### B.     Failure to Accommodate

Buboltz next argues that RAI failed to accommodate her disability.  An employer's failure to make a reasonable accommodation is a separate form of prohibited discrimination under both the ADA and the Rehabilitation Act.  Peebles v. Potter, 354 F.3d 761, 765 (8th Cir. 2004).  If an employee fails to make a request for accommodation, then his employer has no duty to accommodate.  Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002).  If, however, an employee does request an accommodation, the employer must engage in an interactive process to determine whether reasonable accommodations are possible.  Id.  If such accommodations are possible, then the employer must reasonably accommodate that request, but need not provide the exact accommodation requested.  Cravens v. Blue Cross & Blue Shield, 214 F.3d 1011, 1019 (8th Cir. 2000).

To prove that an employer failed to participate in an interactive process regarding a reasonable accommodation, an employee must show the following: (1) that the employer knew she was disabled; (2) that she requested accommodations; (3) that the employer did not make a good faith effort to assist her in making accommodations; and (4) that the employer could have reasonably accommodated, but for its lack of good faith.  Id.  at 1021.  When an employer fails to engage in an interactive process, that is prima facie evidence of bad faith.  Ballard, 284 F.3d at 960.

Here, the parties dispute whether Buboltz' statement, "I have, like, numerous devices that I can use" constituted a request for reasonable accommodations.  When this statement is read in context,[6] it is clear Buboltz did not request an accommodation, but instead argued she did not need an accommodation.  Thus, RAI's

---

[6]In a meeting with Leppla and another RAI manager, Buboltz stated, "I have, like, numerous devices that I can use.  When I, when I do my meds, I, I use my, you know, things on–actually, they are giving me a (inaudible) new piece of equipment."

duty to accommodate never arose, and Buboltz' claim fails. Nevertheless, even if we treated Buboltz' statement as a request, her claim fails because RAI honored the request by restructuring Buboltz' job so she no longer had to dispense medications or work alone with the residents. Dropinski v. Douglas County, Neb., 298 F.3d 704, 709-10 (8th Cir. 2002) (holding job restructuring is an example of an available accommodation).

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's decision.

BYE, Circuit Judge, dissenting.

The district court erred by weighing the evidence, resolving issues of disputed fact, and ruling as a matter of law Monica Buboltz did not suffer an adverse employment action. For these reasons, this matter should be reversed and remanded for trial.

I

In ruling on a motion for summary judgment, it is not the court's role to decide the merits. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court must simply determine whether there exists a genuine issue for trial, i.e., whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in her favor. Id. The court must not weigh evidence or make credibility determinations, as those functions are for the jury. Id. at 255.

Summary judgment should seldom be granted in the context of employment discrimination cases because of their being inherently fact based. Mayer v. Nextel W. Corp., 318 F.3d 803, 806 (8th Cir. 2003). The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in her favor. Anderson, 477 U.S. at 255. When viewed in the light most favorable to her claim, the evidence Buboltz presented could persuade a jury to return a verdict in her favor. Genuine issues of material fact therefore exist which require a trial; the district court's summary judgment ruling should be reversed. Anderson, 477 U.S. at 257; Kenney v. Swift Transp., Inc., 347 F.3d 1041, 1044-45 (8th Cir. 2003) (reversing district court's grant of summary judgment to defendant employer because it improperly weighed the evidence).

## II

As the Court indicates, only the third prong of Buboltz's prima facie case – whether she suffered an adverse employment action – is at issue. Adverse employment actions "need not always involve termination or even a decrease in benefits or pay." Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 717 (8th Cir. 2003). Reassigning an employee to a position with significantly different responsibilities or otherwise creating a detrimental change in working conditions can constitute an adverse employment action. See, e.g., id.; Brown v. Cox, 286 F.3d 1040, 1045-46 (8th Cir. 2002); Phillips v. Collings, 256 F.3d 843, 848 (8th Cir. 2001). Buboltz alleges two primary adverse employment actions: (1) RAI eliminated essential functions of her job, and (2) RAI constructively discharged her.

The issue of whether RAI eliminated essential functions of Buboltz's job is one of disputed material fact. RAI argues administering medication is not an essential job function because it comprised a small fraction of Buboltz's time. Buboltz counters the dispensation of medication is one of the most important aspects of care-giving and eliminating the function was tantamount to a reprimand. With respect to prohibiting Buboltz from working alone with residents, RAI claims the home was regularly triple-staffed. Buboltz was able to retain her position on the work schedule, despite this limitation, because there were always other DSPs on staff to supervise her resident

interactions. Buboltz argues requiring another person to look over her shoulder whenever she interacted with a resident limited her efficacy and, again, branded her incompetent.

An essential function is a "fundamental job dut[y] of the employment position the individual with a disability holds or desires" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1); Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 787 (8th Cir. 1998). A job function may be considered essential for any of several reasons, including because (1) the reason the position exists is to perform that function, and/or (2) there are a limited number of employees available among whom the performance of that job function can be distributed. 29 C.F.R. § 1630.2(n)(2)(i), (ii). The EEOC regulations contain a non-exhaustive list of seven types of evidence which may be considered in determining whether a particular function is essential. See 29 C.F.R. § 1630.2(n)(3). The amount of time spent performing the function is merely one. Id.

It was error for the district court to determine RAI did not eliminate essential functions of Buboltz's job and thus Buboltz did not suffer an adverse employment action; such a determination is the province of the jury. The DSP written job description includes taking care of the residents' medical needs and requires ability to "make decisions and complete tasks with little or no supervision." Appellant App. at 16. Buboltz argues one of the most important responsibilities of a DSP is to administer medication; if no DSPs administered medication, the medical care of the residents would be greatly compromised. At least three other RAI employees testified medication administration and working alone with residents were essential duties and they believed the elimination of these responsibilities was materially adverse, unfair, unwarranted, and tantamount to accusing Buboltz of incompetence. Id. at 175, 182-84, 194, 197-98. Furthermore, with only two or three DSPs present on a given shift, there are a limited number of employees available to perform those functions Buboltz

was prohibited from performing, especially when one DSP takes a break, or runs an errand with other residents. See id. at 174, 196.

The Court states Buboltz failed to show what direct care she was precluded from providing to the residents based on these restrictions. To the contrary, Buboltz provided testimony from her coworkers explaining how RAI's restriction prevented her from engaging in direct care as she had previously. Patricia Nelson testified Buboltz used to take residents to basketball games, concerts, and would often spend individual time with residents. Id. at 190. Cathy Galvin, RAI Human Resources Generalist, stated Buboltz would no longer be able to take the residents grocery shopping or bowling. Id. at 97. Buboltz testified there were occasions when a DSP would need to stay home with a client who did not desire to participate in an outing with the others. Id. at 10. She would no longer be able to perform this function. Buboltz argues the restriction prevented her from providing direct care to residents such as bathing them, assisting them while going to the bathroom, or providing other hygienic care, due to space limitations in the bathroom. Appellant Reply Br. at 7-8. She also argued the restrictions prevented her from doing typical one-on-one activities such as taking residents on a walk or even playing a game with them in a separate room. Id.

It was error for the district court to conclude Buboltz was not constructively discharged. When viewed in the light most favorable to her claim, the evidence Buboltz presented could persuade a jury RAI altered Buboltz's working conditions with the intent to force her to resign or with the reasonable foresight that she would resign as a result of its actions. See Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999) ("A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions.") RAI eliminated important, arguably essential, functions of Buboltz's job and ignored its

responsibility to determine first whether Buboltz could be accommodated. The ADA compels employers to "engage in an interactive process to identify potential accommodations that could overcome the employee's limitation," Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 902 (8th Cir. 2006), and modify their work requirements to enable disabled individuals to have the same opportunities as their disabled counterparts, Peebles v. Potter, 354 F.3d 761, 767 (8th Cir. 2004). The failure of an employer to engage in this interactive process is prima facie evidence the employer may be acting in bad faith. Canny, 439 F.3d at 902.

While it is true RAI waived the driving requirement when it hired Buboltz initially, an employer's duty to accommodate is a continuing one and is not exhausted by merely one effort. Humphrey v. Memorial Hosp. Ass'n, 239 F.3d 1128, 1138 (9th Cir. 2001). Viewing the evidence in the light most favorable to Buboltz, when RAI concluded she should not dispense medication or work alone with residents, Buboltz requested a meeting in which she raised the issue of reasonable accommodations with her manager and with Human Resources.[7] RAI refused to discuss possible accommodations which might allow her to maintain these job responsibilities. RAI also refused to communicate the new restrictions on Buboltz to the rest of the staff. Instead, RAI required Buboltz to inform her coworkers of her restricted duties. RAI suggested she explain the restrictions were self-imposed to make Buboltz more comfortable. Appellant App. at 103. A jury could have found it foreseeable such a situation would create a hostile work environment and negatively affect Buboltz's

---

[7]The meeting was held on March 8, 2005, and was recorded. See Appellant App. at 83-114. Buboltz also submitted into evidence a March 11, 2005, letter she claims she wrote to the president of RAI, Bill Olson. The letter expresses her dissatisfaction with the "unfair and clearly discriminatory" changes RAI made to her job responsibilities and her work schedule. Id. at 14. She concluded "[a]ll I want is to do my job as I was hired 5 years ago to do and as I have been doing, my 1 day a week, no weekends or holidays, giving meds, taking the ladies out in the community, and respect from my co-workers." Id. at 14-15. Mr. Olson denies ever receiving the letter.

relationships with her coworkers, who began to resent her because "she does not pull her own weight and just lets everyone else do everything." Id. at 269; see also id. at 175, 187-88.

In addition, one week after eliminating two of Buboltz's job responsibilities, RAI dramatically changed her schedule. Where she had been working an average of one shift of four hours per week, RAI now required her to work an additional two shifts of eight or nine hours on Saturday and Sunday, every other week. When Buboltz began using her paid time off benefits to avoid working the weekend hours, RAI stopped regularly scheduling her for her weekday shift. Id. at 141-43. RAI next subjected her to her first performance review in the five years she was in its employ, creating a negative record where there was previously none at all. Buboltz and her coworkers testified she did not want to leave her position at RAI, but the changes it implemented "just got to be too much of a stress on her life, on herself." Id. at 91, 172, 175, 199. A reasonable jury could conclude RAI intended to force her to resign, or could have reasonably foreseen its actions would have led Buboltz to do so.

## III

Whether RAI subjected Buboltz to an adverse employment action is a question laden with disputed material facts. Buboltz has presented evidence sufficient for a reasonable jury to conclude RAI eliminated essential job functions and constructively discharged her. The district court erred by weighing the evidence, resolving the issues of disputed fact, and ruling as a matter of law Buboltz did not suffer an adverse employment action. I would therefore reverse and remand for trial.

For the foregoing reasons, I dissent.

_____

-14-