Kelly **MERFELD** and Jason Merfeld, Plaintiffs,

v.

**WARREN COUNTY HEALTH SERVICES and Warren County Board of Health, Defendants.**

**No. 4:07–cv–00409–JEG.**

United States District Court, S.D. Iowa, Central Division.

Feb. 12, 2009.

Erik S. Fisk, Jaki K. Samuelson, Whitfield & Eddy PLC, Des Moines, IA, for Plaintiffs.

Patrick D. Smith, Bradshaw Fowler Proctor & Fairgrove, Des Moines, for Defendants.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment, which Plaintiff[1] resists. A hearing on the Motion was held on January 15, 2009. Plaintiff was represented by attorney Erik Fisk. Defendants were represented by attorney Patrick Smith. The matter is fully submitted and ready for disposition.

## I. BACKGROUND

The following facts are either not in dispute or viewed in the light most favorable to the nonmoving party.

On December 13, 2004, Plaintiff Kelly Merfeld (Merfeld) began working as a bill-

ing specialist for Defendant Warren County Health Services (Health Services), a division of Defendant Warren County Board of Health (the Board) (collectively, the Defendants). Merfeld's general responsibilities involved clerical duties relating to medical service billing.

On or about February 14, 2006, Merfeld learned she was pregnant and shared that information in confidence with her direct supervisors, Bobette Miller (Miller) and Jodene DeVault (DeVault). For personal medical reasons, Merfeld was reluctant to announce her pregnancy and did not do so for another month.

In late March of 2006, Merfeld was diagnosed with a serious pregnancy-related medical condition. Merfeld's doctor instructed Merfeld to "take it easy" at work. When Merfeld conveyed this information to DeVault and Miller, DeVault asked Merfeld to obtain the doctor's restrictions in writing.

On April 3, 2006, Merfeld's physician completed a checklist-style "Return to Work Patient Status Report" form provided by Health Services.[2] Therein, Merfeld's physician indicated Merfeld had a "zero" pound lifting restriction and should avoid the following activities: pushing, pulling, walking, twisting, stooping, bending, standing, kneeling, squatting, lifting, working above shoulder level, reaching above her head, working below waist level, and reaching below waist level. According to Merfeld, after she submitted the form to Health Services, DeVault initially conveyed to Merfeld that Health Services

1. Defendant moves for summary judgment only on claims brought by Plaintiff Kelly Merfeld.

2. The parties appear to agree that April 3, 2006, was the date Merfeld's physician signed

the "Return to Work Patient Status Report." The form, however, shows April 4, 2006, as the signature date and April 3, 2006, as the date of examination. Pl.'s App. 46.

could accommodate her restrictions.[3] Merfeld continued to perform her work without difficulty; however, shortly after Merfeld submitted her medical restrictions, DeVault informed Merfeld she had concerns that Health Services would be unable to accommodate the restrictions as represented by Merfeld's physician on the Health Services medical-restrictions form. Merfeld told DeVault her understanding of her physician's restrictions was that she could still perform her regular job on a full-time basis.

DeVault, Warren County Attorney Gary Kendell (County Attorney), and certain members of the Board discussed Merfeld's restrictions and decided the matter should be presented to the Board. As a public body this was a public meeting. It is disputed whether Merfeld was asked if she preferred a closed session; but, it is undisputed the Board took no affirmative action to close the session involving this personnel matter. Merfeld denies that DeVault ever told Merfeld that Merfeld could request to have a closed session before the Board.

At the April 7, 2006, public board meeting, members of the Board asked Merfeld pointed questions about her pregnancy, the complications of her serious pregnancy-related medical condition, and her other medical history. Before Merfeld arrived at the meeting, certain members of the Board made remarks about Merfeld's medical restrictions, including a suggestion that Merfeld should use a mobility scooter and a mechanical reaching aid.

The Board decided that before Merfeld's next regularly scheduled medical appointment, Merfeld's supervisors would provide Merfeld with a revised medical-restrictions form for Merfeld's physician to complete. Health Services allowed Merfeld to continue working, which Merfeld did without incident, from the date of the board meeting (April 7) until the date of Merfeld's next regularly scheduled doctor's appointment (April 17). On the day of Merfeld's appointment, Health Services had yet to provide her with the revised medical-restrictions form, so Merfeld asked for the revised form. Health Services gave Merfeld a form entitled "Physician's Authorization to Render Medical Care and Physician's Return to Work Evaluation." DeVault testified that this form was not developed specifically to address Merfeld's pregnancy-related medical condition; rather, the form was provided by Warren County and contained a box referring to rendering care in compliance with "worker's compensation laws" and a second box with a standard checklist similar to the form originally provided. Defs.' App. 44–45; Pl.'s App. 47, Dep. Ex. K.

On April 18, 2006, when DeVault asked Merfeld for the completed form, Merfeld indicated her doctor was unable to complete the form during her appointment. DeVault directed Merfeld to have the form faxed to Health Services right away. Merfeld still had not submitted the form by 4:30 p.m. on April 18. DeVault told Merfeld she could not return to work until the form was submitted. Between April 19 and April 24, Merfeld's physician completed several forms and communicated with Defendants regarding completion of Merfeld's medical-restriction forms.[4] Finally,

---

**3.** At her deposition, DeVault testified that she did not verbalize her approval or disapproval when Merfeld first provided DeVault with the original, completed medical-restrictions form. Pl's App. 31.

**4.** On April 21, 2006, Warren County Payroll Administrator Peg Hutchison sent an email to DeVault and Miller informing them that Merfeld returned to see her physician on April 21. The physician needed Merfeld's job description to complete the restriction form, and

on April 24, Merfeld's physician submitted a document that satisfied Health Services, and Merfeld was allowed to return to work. Merfeld had to remain off work from April 19 through April 24 and was forced to use thirty-two hours of combined vacation time (twenty-three hours) and Family Medical Leave Act (FMLA) time (nine hours).

On May 9, 2006, Merfeld's attorney faxed a letter to the Warren County Attorney, which detailed instances of discrimination or improper treatment toward Merfeld and set forth five requests for relief. Defendants honored four of Merfeld's requests but refused Merfeld's request to restore the vacation and FMLA time that she took while awaiting the clarifications of her restrictions from her doctor.

On May 15, 2006, DeVault issued a memo to Health Services' employees instituting a policy that required all employees to work normal business hours unless otherwise approved by a supervisor (May 15 policy). The memo stated the following:

Effective immediately. If you request time off for any reason you will be expected to use your benefit time for payment of the time you have requested off. We will not automatically approve "I'll make up time later in the week" for requests off. If you do not have vaca-

tion or sick time to use, you will more than likely have to take the time off without pay, pending approval of your supervisor. If a nurse has a schedule that is very heavy one day and light the next, you may get approval from me to rearrange hours so you do not earn comp time or have to use vacation time. . . . If clerical staff have any concerns about this, please go to Bobette with your questions or to request approval for any changes in hours. Our office hours are from 8–4:30. If your job requires you to be here prior to 8 am you must receive permission from your supervisor and adjust this time during the same working day so that no more than 8 hours are worked in one single day.

(Annette is an exception to this as she was hired to work 10 hour days.) If you have any questions, please see me.[5]

Defs.' App. 90.

On June 29, 2006, Merfeld received a performance review wherein Miller marked Merfeld unfavorably in the categories of "attitude" and "job knowledge," and commented that Merfeld's "personality had made it uncomfortable [sic] that co-workers are intimidated to ask questions due to actions that might be taken." Pl.'s

---

after providing the description, Merfeld was told the form could not be completed until April 24.

**5.** Merfeld refers to this practice of making up time as "flex" time. Health Services denies that it had a flex time policy and clarifies that it established the May 15 policy to stop perceived flex time abuses by Health Services employees, specifically Health Services nurses who had significant amounts of "on call" time. Defendants clarify that Health Services does have a "comp time" policy that states,

The Warren County Personnel Policies describe compensatory time as hours worked in excess of (40) hours in any workweek. Paid leaves, unscheduled vacation time,

sick time and compensatory time shall not be counted as working time for the purpose of determining overtime. (Refer to WCHS overtime policy) Compensatory time is granted at time and one-half (one and one-half hours off for each hour of overtime worked). Warren County Personnel Policies state a maximum of (60) sixty hours may be carried over from one fiscal year to the next. Warren County Health Services employees will be responsible to monitor the amount of compensatory time he/she has accrued.

Defs.' App. 79. Merfeld does not allege discriminatory treatment regarding use of comp time.

Resp. to Defs.' Statement of Undisputed Facts (PRSUF) ¶ 30–34; Defs.' App. 91–92. In addition, Miller and DeVault told Merfeld her coworkers at Health Services were avoiding Merfeld because of the letter Merfeld's attorney sent on May 9.

On August 6, 2006, Merfeld gave birth prematurely to her daughter and was on maternity leave from August 7 until October 9, 2006. On September 6, 2006, while on maternity leave, Merfeld filed an administrative complaint with the Iowa Civil Rights Commission (ICRC), which was cross-filed with the Equal Employment Opportunity Commission (EEOC), alleging pregnancy discrimination, retaliation, and harassment. Therein, Merfeld alleged suffering retaliation as a result of both the May 9, 2006, letter and the September 6, 2006, complaint she filed with the ICRC and EEOC. Merfeld alleged that (1) her co-workers avoided and shunned her; (2) her supervisors avoided her and did not want to pay any attention to her or answer any of her questions; (3) Miller and DeVault told fellow Health Services employee Denise Chumbley (Chumbley) that they wanted to force Merfeld to quit her employment with Health Services; and (4) Miller told Chumbley she planned to "make Kelly [Merfeld]'s life miserable." PRSUF ¶ 30; Pl.'s App. 40.

After Merfeld returned from maternity leave, she claims the retaliation continued. On Merfeld's first day back, Merfeld discovered her personal belongings had been boxed and placed in her supervisor's (Miller)'s office; Merfeld's desk had been assigned to another employee, and there was no empty desk available for Merfeld; and Merfeld was assigned to share an office with Miller, against whom Merfeld had brought the initial discrimination complaint. In addition to being the only employee required to share office space with a supervisor, Merfeld was assigned to sit

at a table instead of a desk; she was given no phone; she was given no work assignment, and the work she performed prior to taking maternity leave had been assigned to other employees; and she was subjected to harsh recrimination by Miller. According to Merfeld, as a result of Health Services' disclosure of medical information, harassment, and retaliation, she became an emotional "basket case"; she cried virtually every day; she did not want to return to work, but she had to return because of her daughter's critical medical needs due to premature birth and the necessity of maintaining her insurance through Health Services. Merfeld experienced regular anxiety attacks, including one on her final day with Health Services. Merfeld's emotional turmoil was exacerbated by the tireless medical attention her premature daughter required, a fact of which Health Services personnel were aware. According to Merfeld, the conditions continued and ultimately led Merfeld to resign on February 12, 2007.

After obtaining a right to sue letter, Merfeld filed this action alleging pregnancy discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e–2000e–17, as amended by the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), 2000e–2(a)(1), and the Iowa Civil Rights Act (ICRA) (Count I); invasion of privacy (Count II); negligent disclosure of personal medical information (Count III); intentional infliction of emotional distress (Count IV); retaliation in violation of Title VII and the ICRA (Count V); and loss of consortium on behalf of Merfeld's husband, Jason Merfeld (Count VI). Defendants filed this Motion for Summary Judgment on Counts I, III, IV, and V of Merfeld's complaint, arguing no genuine issues of material fact remain for trial. Merfeld resists.

**950**

## II. DISCUSSION

### A. Standard for Summary Judgment

"Summary judgment is appropriate when no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law.... [I]f the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Walnut Grove Partners, L.P. v. Am. Fam. Mut. Ins. Co.*, 479 F.3d 949, 951–52 (8th Cir.2007) (citing Fed.R.Civ.P. 56(c) (internal quotation omitted)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to defeat a motion for summary judgment, the nonmoving party "may not rely merely on allegations or denials in its own pleading," it must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). "Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Skare v. Extendicare Health Servs., Inc.*, 515 F.3d 836, 840 (8th Cir. 2008). "Mere allegations, unsupported by specific facts or evidence beyond the non-moving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1110 (8th Cir. 2007) (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir.2007)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc.*, 382 F.3d 852, 856 (8th Cir.2004).

■ In employment discrimination cases, "[a] plaintiff may survive a motion for summary judgment in two ways—by presenting 'direct evidence' of discrimination, or by creating 'the requisite inference of discrimination,' including 'sufficient evidence of pretext,' under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir.2008) (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004)).

■ "Direct evidence ... includes evidence of 'remarks of the employer that reflect a discriminatory attitude,' as well as 'comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions.'" *Id.* (quoting *EEOC v. Liberal R–II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir.2002)); *see also Gross v. FBL Fin. Servs., Inc.*, 526 F.3d 356, 359 (8th Cir.2008) (" 'Direct evidence' for these purposes is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action.") (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir.1997)), *cert. granted*, —— U.S. ——, 129 S.Ct. 680, 172 L.Ed.2d 649 (2008).

■ If the plaintiff does not produce direct evidence of discrimination, in order to defeat a motion for summary judgment, the plaintiff must present a prima facie case of discrimination under the *McDonnell Douglas* paradigm. To establish a prima facie case of pregnancy discrimination, Merfeld "must show: 1) she is a member of a protected class; 2) she met her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees who were not members of the protected class were treated differently." *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir.2007).

If the plaintiff establishes a prima facie case of discrimination, "the employer may advance a legitimate, nondiscriminatory reason for the employee's discharge. The burden of production then returns to the plaintiff to show that the employer's reason is a pretext for pregnancy discrimination." *Quick v. Wal–Mart Stores, Inc.,* 441 F.3d 606, 610 (8th Cir.2006) (citing *McDonnell Douglas,* 411 U.S. at 802, 804, 93 S.Ct. 1817 (internal citation omitted)). "At the summary judgment stage, under the 1991 Act, the issue is 'whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action,'" and "[i]f so, then 'the presence of additional legitimate motives will not entitle the defendant to summary judgment.'" *Roberts,* 528 F.3d at 1127 (quoting *Griffith,* 387 F.3d at 736, 735).

## B. Pregnancy Discrimination

■ "The Pregnancy Discrimination Act amended Title VII to provide that discrimination 'on the basis of pregnancy' is a form of sex discrimination." *Fjelsta v. Zogg Dermatology, PLC,* 488 F.3d 804, 809 (8th Cir.2007) (quoting 42 U.S.C. §§ 2000e(k), 2000e–2(a)(1)). The ICRA similarly prohibits such conduct. *See* Iowa Code § 216.6(2)(a) ("A written or unwritten employment policy or practice which excludes from employment applicants or employees because of the employee's pregnancy is a prima facie violation of this chapter.").[6] "Title VII only guarantees that pregnant women are treated as well as nonpregnant employees who are simi-

larly situated." *Dillon v. City of Conway, Ark.,* 92 Fed.Appx. 385, 386 (8th Cir.2004) (unpublished per curiam). "The PDA does not create substantive rights to preferential treatment. On the contrary, the PDA allows employers [to] treat pregnant women as badly as they treat similarly affected but nonpregnant employees. The opposite, however, is also true—employers must treat pregnant women as well as they treat similarly affected employees." *Deneen v. Nw. Airlines, Inc.,* 132 F.3d 431, 436–37 (8th Cir.1998) (internal quotations and citations omitted).

Defendants argue Merfeld has no direct evidence of discrimination and has failed to establish a prima facie case of pregnancy discrimination because she cannot prove she suffered an adverse employment action at any time prior to filing her administrative complaint with the ICRC. Merfeld resists asserting she should survive Defendants' Motion for Summary Judgment because she "has such strong direct evidence," or alternatively, "[e]ven if the Court does not believe the evidence demonstrates a specific link between discriminatory animus and the alleged discriminatory action, [her] claims nonetheless survive summary judgment under the *McDonnell Douglas* burden-shifting analysis." Pl.'s Br. 10. Merfeld frames her resistance in terms of the *McDonnell Douglas* paradigm.

Defendants do not dispute that Merfeld was a member of a protected class or that Merfeld was qualified to perform the func-

---

**6.** The Court analyzes Merfeld's Title VII and ICRA claims under the same framework. *See Johnson v. Univ. of Iowa,* 431 F.3d 325, 332 (8th Cir.2005) (citing *Henthorn v. Capitol Commc'ns, Inc.,* 359 F.3d 1021, 1024 n. 2 (8th Cir.2004)). Defendants unpersuasively argue that Merfeld's ICRA claims fail because they do not relate to Merfeld's hiring, discharge, or benefits under a disability plan. *See* Iowa

Code § 216.6(2)(b)-(e). Merfeld clearly asserts she suffered an adverse employment action, including that she was constructively discharged due to Defendants' discriminating against her based on her pregnancy, which constitutes "exclu[sion] from employment ... because of pregnancy" and thus states a claim under the ICRA.

tions of her job, and therefore Merfeld satisfies the first two elements of a prima facie case of pregnancy discrimination. Defendants argue Merfeld is unable to demonstrate she suffered an adverse employment action, and therefore she fails to present a prima facie case of pregnancy discrimination. Merfeld argues the following events, which occurred after she told her supervisors about her pregnancy, constitute adverse actions: (1) being required to appear at the public April 7 board meeting during which she was compelled to disclose personal medical information regarding her pregnancy and was subjected to a board member mocking her pregnancy-related medical restrictions when other employees with non-pregnancy related medical restrictions were not subjected to such scrutiny; (2) being required to repeatedly seek clarification from her physician regarding her pregnancy-related medical restrictions; (3) being held subject to Health Services May 15 policy, adopted just six days after Merfeld's attorney sent the May 9 letter requesting, among other things, a request to allow Merfeld to use flex time for her pregnancy-related appointments; and (4) being subjected to her supervisors' criticisms and derogatory comments.

### 1. Adverse Employment Action

■ "Proof of an adverse employment action requires a 'tangible change in duties or working conditions that constitute a material disadvantage.'" *Phillips v. Collings,* 256 F.3d 843, 849 (8th Cir. 2001) (quoting *Cossette v. Minn. Power & Light,* 188 F.3d 964, 972 (8th Cir.1999)). However, actions short of termination may constitute adverse employment actions. *Id.*

■ In determining whether Merfeld suffered an advise action, the Court considers several actions taken by Defendants after Merfeld announced her pregnancy—more specifically, after Merfeld announced her pregnancy-related medical condition. *See Phillips,* 256 F.3d at 849–50.

### a. April 7 Board Meeting

After Merfeld submitted her physician's written medical restrictions to DeVault, DeVault sought the advise of the County Attorney and a board member. The three of them determined the Board should discuss Merfeld's pregnancy-related medical restrictions at the next board meeting. As Merfeld entered the April 7 board meeting, one board member said, "That's a long way to walk. We could let her use one of those scooters.... I'm not kidding." Pl.'s App. 59. During the meeting, Board members questioned Merfeld about her physician's written restrictions and Merfeld explained that her physician's verbal restrictions differed dramatically from his written restrictions in that the verbal restrictions were less severe. Board members went on to ask Merfeld probing questions about her medical history that were seemingly unrelated to her current work restrictions, such as, "Now is this your first pregnancy?"; "Now had you had other miscarriages?"; "Did you require complete bed rest at that time, too?"[7] Pl.'s App. 60. One member of the Board asked Merfeld whether her doctor suggested that she should "really take off work and stay home and do nothing in order to carry this baby." Pl.'s App. 61.

Contrary to Defendants' assertion that this is the same procedure used for ap-

---

7. Nothing in the record supports the assertion that Merfeld was ever put on complete bed rest. To the contrary, when Merfeld submitted the second medical-restrictions form,

Merfeld's physician told Merfeld he was not going to put her on disability because "she's not disabled." Defs.' App. 83.

proving accommodations for other employees, the record before the Court suggests Merfeld was singled out for this treatment. Former employee Maria Christine Smith (Smith) attests that while employed by Health Services, she suffered a permanent, work-related injury that required job reassignment. Smith states that DeVault and Miller assisted her in submitting a letter to the Board to request the necessary accommodations. Inasmuch as Smith and Merfeld both had to seek Board approval of their accommodation requests, they were similarly situated, it appears, however, that the similarities end there. Smith was not asked to appear at an public board meeting[8] where she was arguably taunted and questioned about her personal, unrelated medical history. In addition, according to Smith's statement, Miller and DeVault assisted Smith in submitting her letter to the Board. On this record, Miller and DeVault offered no such assistance to Merfeld.

### b. Clarification of Medical Restrictions

At the April 7 board meeting, the Board agreed that Merfeld and DeVault would "get together the first of the week and get something written up and mail [the new form] to [Merfeld's physician]" to "define what type of sedentary work" Merfeld could perform. Pl.'s App. 63. In response, DeVault said she would "try to get with Kelly [Merfeld] Monday and fax it to [Merfeld's physician] Monday afternoon" so that when Merfeld attended her next scheduled appointment on April 17, 2006, her physician would have had time to look at the form and "send it [back] with [Merfeld]." *Id.* Merfeld alleges DeVault never met with her regarding a new form and on April 17, the day of her appointment, Merfeld had to request the "new" form and was provided with another "return to work" form that did not elicit clarification about Merfeld's restrictions relative to her job functions.[9]

The next day, DeVault asked Merfeld for the completed form. Merfeld indicated the doctor did not have time to complete the form the previous day. DeVault asked Merfeld to contact her physician and have the form faxed to Health Services. However, by the end of the work day, Merfeld had not provided DeVault with the completed form. DeVault told Merfeld not to return to work without the completed form. When Merfeld's physician completed the new form provided by Health Services, however, it still did not provide the clarification Health Services required. Consequently, Merfeld had to repeatedly contact her physician. Ultimately, Merfeld's physician requested a copy of Merfeld's job description in order to determine Merfeld's restrictions.

To comply with Defendants' request for further clarification so she could return to work, Merfeld had to (1) make several

---

**8.** According to DeVault, she recalls "telling [Merfeld] she could request a closed session on three occasion." Defs.' App. 39. Merfeld testified that the first time DeVault discussed the board meeting and asked Merfeld to attend was just minutes before the meeting began on April 7. Pl.'s App. 23. A dispute of fact exists regarding whether DeVault provided Merfeld adequate time to request a closed meeting.

**9.** There is a dispute of fact as to when Health Services provided Merfeld with the new form.

DeVault testified that she assigned Miller the task of working with Merfeld to create a new form and acknowledges that Merfeld was provided a "Warren County" form that was not typically used by Health Services. Defs.' App. 43–44. Miller testified that she got online and looked at several release forms and "created" the new form on Friday, April 14 or Saturday, April 15. *Id.* at 67, 71. The form has a Warren County logo at the top and appears to be an unmodified, standard release form.

trips to see her physician, (2) stay home from work, and (3) use her remaining vacation time as well as some FMLA time. Defendants concede there is a dispute of fact regarding who was at fault for this delay. Merfeld asserts she should not have been penalized because the delay resulted from Health Services neglecting its responsibility, as directed by the Board, to provide Merfeld with a satisfactory form to submit to her physician. Defendants counter that Merfeld had the burden of obtaining her physician's clarification because, unlike in work-related injury cases like Smith's, Defendants could not contact Merfeld's physician.

Defendants' alleged inability to directly contact Merfeld's physician did not remove Defendants' self-created obligation to provide Merfeld with a complying form that would satisfy Defendants' concerns regarding Merfeld's restrictions. At the April 7 board meeting, recognizing that physicians are busy, one board member suggested that a letter be written and sent to Merfeld's physician in advance; that way, "he'd have a couple of weeks to kind of think about it, then discuss it with [Merfeld]" at her April 17 appointment. Pl.'s App. 63. Acknowledging that "physicians are busy," DeVault said she "would probably try to get with [Merfeld] Monday and fax it to [Merfeld's physician] Monday afternoon." *Id.* It is undisputed that DeVault never worked with Merfeld to put together a comply form or that *any* form was ever faxed to Merfeld's physician in advance of Merfeld's April 17 appointment. Instead, Defendants forced Merfeld to stay off work and charged the time against Merfeld's remaining vacation time and used up nine hours of FMLA time that she was reserving for maternity leave.

### c. Flex Time

Merfeld argues Defendants enforced the May 15 flex time policy as to Merfeld but did not apply the policy to Amy Martens (Martens) and Miller. Defendants insist the policy required all employees to use sick, comp, vacation, or FMLA time to attend medical appointments. Defendants further assert that, even if the time-off policy memo could be considered a materially adverse employment action, Merfeld cannot prove Defendants applied the policy in a discriminatory manner to Merfeld as a pregnant employee.

According to Merfeld, Miller took longer lunches and/or ran errands and was allowed to make up that time. Merfeld asserts that she and Miller were similarly situated because they both reported to DeVault.

Miller states that her duties occasionally required her to work hours other than 8:00 a.m. to 4:30 p.m., but she denies ever changing hours without approval. Merfeld concedes she has no evidence that Miller did not have approval for any schedule changes or that those changes were not work related. In addition, even though proving the "similarly situated" element only requires a plaintiff to demonstrate that the employee who is allegedly receiving favorable treatment holds a position that is similar in "all relevant aspects" and not an identical position, *see Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 412 (6th Cir.2008) (concluding for an employment-discrimination plaintiff to demonstrate disparate treatment of a comparable employee, the employee "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;'") rather "the employee with whom the plaintiff seeks to compare ... herself must be similar in 'all the *relevant* aspects'" (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994)), Merfeld nonetheless fails to demonstrate that she and Miller were

similarly situated. Miller held a supervisory, office management position, whereas Merfeld was a billing specialist. Merfeld was not similarly situated to Miller in all relevant aspects.

Merfeld also asserts the May 15 policy was not applied to Martens, who continued to leave work early and come into work late without being charged leave time, whereas Merfeld was required to arrive fifteen minutes prior to her shift, without compensation, so she would be ready to start work immediately at 8:00 a.m. and was not allowed to leave even one minute prior to 4:30 p.m. Smith attests that Martens' flexible lunch hour required others, including Smith and Merfeld, to adjust their own lunch schedules around Martens' lunch schedule. Chumbley attests that Martens was allowed time off to perform massages and then allowed to make up the time at her convenience, whereas Merfeld was not allowed this same flexibility for medical appointments.[10]

Defendants assert that Martens was not similarly situated to Merfeld because Martens worked a 7:30 a.m. to 4:30 p.m. shift with a one-hour lunch break while other Health Services employees, including Merfeld, worked 8:00 a.m. to 4:30 p.m. with a one-half hour lunch break. Aside from Martens' arrival time, Defendants offer nothing to support that Martens was not similarly situated to Merfeld. To the contrary, Smith attested that she and Merfeld had to adjust their own lunch hours to accommodate Martens, which suggests Merfeld, Martens, and Smith shared some responsibilities.

Miller admits that prior to the May 15 policy announcement, she allowed Merfeld "to use some of her break time or her lunch time to be able to kind of use [sic] so that she wouldn't be completely out of time" to attend her medical appointments. Defs.' App. 66. According to Merfeld, this flexibility ceased after Defendants received the May 9 letter from Merfeld's attorney. Although, standing alone, a policy change such as Defendants' May 15 policy regarding flex time would not constitute a materially adverse action, *see Buboltz v. Residential Advantages, Inc.,* 523 F.3d 864, 869 (8th Cir.2008) (concluding a change in policy requiring plaintiff to work weekends did not constitute an adverse employment action because other similarly-situated employees also were required to work weekends), Merfeld has presented evidence that the May 15 policy was not applied to other similarly situated non-pregnant employees. *See, e.g., Walker v. Fred Nesbit Distrib. Co.,* 331 F.Supp.2d 780, 788 (S.D.Iowa 2004) (concluding an employee met her burden of establishing a prima facie case of pregnancy discrimination by producing evidence that her employer provided accommodations for workers suffering off-the-job injuries despite an alleged policy of only offering modified work duties to workers suffering on-the-job injuries).

**10.** Defendants argue (1) Merfeld has no personal knowledge that the May 15 policy was not applied to Martens, (2) Merfeld merely relies on statements Merfeld and Chumbley allegedly overheard Martens making about being allowed to "make up" time, and (3) this evidence constitutes inadmissible hearsay, which is not sufficient to generate a genuine dispute that Martens was treated more favorably.

Merfeld testified that Martens would tell her, "I have got a massage today, so I've got to make this time up." Defs.' App. 10. Both Chumbley and Smith attest to having personal knowledge and observing Martens make up time before or after regular work hours. Pl.'s App. 41, 44. Thus, the sworn statements of Merfeld, Chumbley, and Smith satisfy the requirement of Federal Rule of Civil Procedure 56(e) that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

Defendants argue the May 15 policy was not applied in a discriminatory manner and was implemented primarily because of perceived abuses by Health Services employees who had significant amounts of "on call" time. Defendants assert that nothing about the policy prevented pregnant or non-pregnant employees from attending physician appointments during work hours; it simply required employees to use comp time, vacation time, or "some form of paid time off." Defs.' Br. 8.

The fact that Defendants established the May 15 policy just six days after Merfeld's attorney sent the letter to the County Attorney asking Defendants to restore the four days of vacation and FMLA time Merfeld was required to use while securing clarification of her medical restrictions, coupled with the fact Defendants present no evidence of Health Service employees who were abusing the flex time policy that precipitated the timing of the policy change, casts doubt on Defendants' proffered reason for the timing of the policy change. *See Roberts,* 528 F.3d at 1128–29 (finding a fact question remained as to whether the employer's reason for terminating the plaintiff the day after the plaintiff informed the employer of her pregnancy was motivated by plaintiff's pregnancy despite some evidence that employer's decision to terminate the plaintiff pre-existed any knowledge of the plaintiff's pregnancy, concluding that those "factual disputes cannot be resolved on a motion for summary judgment"). Thus the purpose of the May 15 policy must be analyzed in the context of its proximity to the May 9 letter, and under all of the other circumstances then existing, as a material issue of fact.

### d. Miller's and DeVault's Comments

Merfeld was also subjected to DeVault and Miller's direct and indirect criticisms. At Merfeld's performance review, Miller told Merfeld her co-workers were "intimidated ... due to actions that might be taken," and DeVault asked Merfeld why she had contacted an attorney. Chumbley attested that she personally observed Miller tell DeVault that "she had the means to force Kelly Merfeld to quit" and would "make [Merfeld's] life miserable." Pl.'s App. 40. Chumbley also said she witnessed both DeVault and Miller say that "they did not wish for Kelly Merfeld to return to work at Warren County after her daughter was born." *Id.* at 41. Smith attested that Miller "treated Kelly Merfeld differently than other employees, [for example Miller] would raise her voice and make inappropriate, derogatory comments toward Kelly Merfeld." *Id.* at 44.[11]

Considered in isolation these events—the humiliating questioning and mockery at the April 7 board meeting, the forced use of vacation and FMLA time, the establishment of new policy precluding use of flex time to attend medical appointments, and Miller and DeVault's critical, if not directly discriminatory, comments—might not hurdle the legal threshold of an adverse employment action. *See, e.g.,*

---

11. Arguably these comments made by Merfeld's supervisors represent direct evidence of discrimination. In resisting Defendants' motion for summary judgment, although Merfeld states there is direct evidence of discrimination, she nonetheless defends her claims under the *McDonnell Douglas* burden-shifting paradigm. The Court has analyzed the claims accordingly. *Cf. Roberts,* 528 F.3d at 1128 (noting that although the plaintiff elected not to argue the case on a direct evidence theory, her supervisor's alleged statements, including "What are you going to do about the pregnancy; are you going to keep it?," also served as "an independent basis on which a reasonable jury could find that [the defendant]'s explanation for the employment action was pretextual, and that pregnancy was a motivating factor in the employment decision").

*Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 929 (8th Cir.2007) (concluding "petty slights or minor annoyances" in the workplace do not constitute adverse employment actions). However, at some point in the continuum of disparate treatment the combination of demonstrated animus, coupled with repeated negative impact on the employee, does at least generate a question properly decided by a jury. Under the circumstances of this case and viewing the record as a whole in the light most favorable to Merfeld, the Court finds that Defendants' actions toward Merfeld, which began after Merfeld announced her pregnancy—specifically, after Merfeld informed Defendants of her pregnancy-related medical condition—demonstrate a pattern of behavior targeting Merfeld for adverse treatment to which Merfeld's similarly-situated co-workers were not subjected. The Court concludes the totality of Defendants' conduct toward Merfeld constitutes a materially adverse employment action that was "clearly 'more disruptive than a mere inconvenience or an alteration of job responsibilities' [or][c]hanges in duties or working conditions that cause no materially significant disadvantage.'" *Phillips*, 256 F.3d at 850 (quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994)). *See Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107–09 (8th Cir.2000) (reversing the district court's grant of summary judgment as to plaintiff's racial discrimination claim finding, among other things, employer's sharp reprimand of plaintiff for minor workplace rule infractions for which other employees did not receive reprimands constituted adverse employment actions); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1066 (8th Cir. 1997) (concluding that after ten years of exemplary employment with defendant, being (1) removed of more desirable employment duties, (2) given lower performance evaluations, (3) given oral reprimands

about a poor attitude, (4) subjected to constant surveillance at work, (5) excluded from work meetings, and (6) required to attend retraining seminars, constituted serious employment consequences that adversely affected plaintiff's position). Defendants are not entitled to summary judgment on Merfeld's pregnancy discrimination claims. *See Roberts*, 528 F.3d at 1128–29 (concluding a reasonable jury could find the employer's explanation that the plaintiff's termination was pretextual and that pregnancy was a motivating factor where the plaintiff's employer (1) asked plaintiff what she "was going to do about the pregnancy; are you going to keep it?"; (2) terminated the plaintiff the day after discovering her pregnancy proffering tardiness as the basis for termination; and (3) "wonder[ed] about the pregnancy" and asked whether, "with all the problems," terminating the plaintiff "was probably the best decision"); *see also Orr v. City of Albuquerque*, 531 F.3d 1210, 1216–17 (10th Cir.2008) (concluding a fact issue existed precluding summary judgment where the employer's proffered justifications were pretext for intentional discrimination where the employer required the pregnant employees taking maternity leave to use their accrued sick leave before they could use their non-accruing vacation and comp time, but did not require non-pregnant employees taking leave to do the same).

## C. Retaliation

### 1. Exhaustion of Administrative Remedies

As an initial matter, Defendants argue Merfeld cannot claim constructive discharge as an adverse employment action because Merfeld's resignation occurred after Merfeld filed her administrative complaint with the ICRC on September 6, 2006. Because Merfeld did not file anoth-

er ICRC complaint or amend her original complaint, Defendants argue Merfeld failed to exhaust her administrative remedies. Merfeld argues the retaliation that occurred after she returned to work from maternity leave was a continuation of Defendants' prior retaliatory conduct and thus does not constitute a discrete incidence of retaliation requiring an amended complaint. *See Wedow v. City of Kansas City,* 442 F.3d 661, 673 (8th Cir.2006) ("[R]easonably related subsequent acts may be considered exhausted.").

In her ICRC complaint, Merfeld checked "retaliation" as one of the bases of discrimination and detailed that she had been discriminated against after reporting her concerns to the County Attorney on May 9, 2006. Merfeld specifically alleged that she received an unfavorable performance review on June 29, 2006, and was informed by her supervisors that other employees did not want to have anything to do with her because of the complaint made to the County Attorney. In this action, Merfeld lists the same conduct in her retaliation claim; in addition, Merfeld alleges that when she returned to work, the *same* retaliatory conduct continued. Merfeld alleges the retaliation took the form of being put in an office with one of the supervisors against whom her complaint had been registered, being given an inadequate work station, and being subject to Miller's reproach. Merfeld also alleges that based on the *continuing* retaliatory conduct, the workplace became intolerable and forced her to turn in her resignation. The additional allegations in Merfeld's complaint do not form the basis of a *new and discrete* discriminatory action, and therefore did not require Merfeld to file a new ICRC complaint. *See id.* at 674 (stating that after *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct.

2061, 153 L.Ed.2d 106 (2002), the Eighth Circuit continues to narrowly read the exception to agency exhaustion requirement and declines "to abandon it *in toto* where the subsequent retaliatory acts were of a like kind to the retaliatory acts alleged in the EEOC charge, which were specified to be of an ongoing and continuing nature"). Merfeld's additional instances of retaliation fall into the same category of retaliatory conduct complained of in Merfeld's ICRC complaint. Accordingly, under Eighth Circuit precedent, Merfeld is not prevented from bringing her constructive discharge retaliation claim for failure to exhaust her administrative remedies.

### 2. Prima Facie Retaliation Claim

"To make out a prima facie case of retaliation, [Merfeld] must show: (1) she engaged in protected conduct; (2) a reasonable employee would have found her employer's retaliatory action materially adverse; and (3) the materially adverse action was causally linked to her protected conduct." *Devin v. Schwan's Home Serv., Inc.,* 491 F.3d 778, 785 (8th Cir.2007) (citing *Higgins,* 481 F.3d at 589). "The second prong is 'objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions.'" *Id.* (quoting *Higgins,* 481 F.3d at 578). An action is "materially adverse" if it could have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 60, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Weger v. City of Ladue,* 500 F.3d 710, 726 (8th Cir.2007).

Defendants do not contest that when Merfeld's attorney sent the May 9 letter to

the County Attorney [12] and when she filed her ICRC complaint, she engaged in protected activities. Defendants do argue Merfeld cannot show she suffered a materially adverse employment action. Merfeld asserts the materially adverse actions included being shunned by co-workers, such as Annette Shepherdson; being systematically ignored by her supervisors; receiving an unfavorable performance review; having her personal belongings boxed up; having her work station relocated while she was on maternity leave; having her previous work assigned to other Health Services employees; being given no work assignments; and being subject to harsh treatment by her supervisor (Miller). Merfeld alleges this treatment caused her to cry most of the time, suffer from anxiety attacks and high blood pressure, and eventually to leave her job.

■ Standing alone, Merfeld's subjective feeling that she received lower than deserved performance scores likely would not be considered materially adverse. *See White,* 548 U.S. at 68, 126 S.Ct. 2405 (concluding an objective standard must be used to determine whether an action was materially adverse, thus avoiding the "uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings"); *Devin,* 491 F.3d at 786–87 (concluding written notice of job noncompliance without any other adverse consequences did not constitute a materially adverse action). Similarly, Miller's comments on Merfeld's performance review indicating Merfeld's co-workers were "intimidated" by Merfeld "due to actions that might be taken," standing alone, might be considered "petty slights or minor annoyances" in the work-

place. *See Clegg,* 496 F.3d at 929 (concluding the plaintiff's complaints regarding contentious relations with co-workers were not actionable because " "Title VII ... does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." ") (quoting *Carpenter v. Con–Way Cent. Express, Inc.,* 481 F.3d 611, 619 (8th Cir.2007) (quoting *White,* 548 U.S. at 68, 126 S.Ct. 2405)). However, Miller's written criticism was verbally reinforced by both Miller and DeVault during Merfeld's performance review. Both supervisors told Merfeld that "because [Merfeld] talked to an attorney ... people didn't want anything to do with [Merfeld] and ... didn't want to have any repercussions [or] have [Merfeld] come back on them for any reason." Pl.'s App. 7. DeVault also told Merfeld "not to contact an attorney any longer" and "to cease that action immediately." *Id.* at 11.

This treatment constitutes more than mere ostracism by co-workers and a subjectively poor performance review. Here, a reasonable juror could find Merfeld's supervisor used a performance review as the vehicle to criticize Merfeld for seeking legal counsel and that both supervisors repeated the criticism during Merfeld's in-person performance review by informing Merfeld she was being shunned because she sought the counsel of an attorney. In addition, Chumbley attests that Miller and DeVault repeatedly expressed their desire to force Merfeld to quit and that Miller vowed to make Merfeld's "life miserable." Pl.'s App. 40.[13] Chumbley also attests Mil-

---

12. For purposes of this motion, Defendants concede a factual dispute exists as to whether sending the letter constitutes a protected activity under Title VII.

13. Although Chumbley does not provide the dates that the conversations between Miller and DeVault occurred, Chumbley did not begin working for Health Services until July

ler and DeVault remarked that they did not want Merfeld to return after her baby was born.

Merfeld's second protected action, the filing of her ICRC complaint, occurred on September 6, 2006, during Merfeld's maternity leave. Merfeld alleges "the retaliation got worse" after she returned from maternity leave. Pl.'s Br. 6. The adverse actions included (1) having her personal belongings boxed up and placed in Miller's office, (2) having her desk reassigned to another employee and her work station being relocated inside Miller's office, (3) being given a wobbly table as a work station without a phone or office supplies, (4) being given insignificant or no work assignments, (5) being subjected to harsh recrimination from Miller, (6) being ignored and snubbed by co-workers, and (7) having Miller and DeVault not speak to her and ignore her questions. Chumbley verifies that Merfeld was subject to this adverse treatment, adding that Chumbley observed Miller humiliate Merfeld by yelling at her, subject Merfeld to different work expectations than other employees, criticize the quality of Merfeld's work without basis, and subject Merfeld to different rules concerning her work hours.

As with the negative performance review and the ostracism by co-workers, the actions taken against Merfeld after she returned from maternity leave, *taken in isolation,* may not be considered materially adverse. *See, e.g., Recio v. Creighton Univ.,* 521 F.3d 934, 938 (8th Cir.2008) (concluding that a change in the plaintiff's teaching schedule to one that was not the best fit for the plaintiff and plaintiff's perceived ostracism by other members of the faculty, even if proved, did not constitute materially adverse action); *Vajdl v. Mesabi Acad. of KidsPeace, Inc.,* 484 F.3d 546,

552 (8th Cir.2007) (concluding that largely subjective harm such as the plaintiff's perception that a restriction placed on her made her "feel worthless" was not materially adverse and therefore not actionable because it would be unlikely to dissuade a reasonable person from making a charge of discrimination); *Carpenter,* 481 F.3d at 617 (reiterating that "petty slights, minor annoyances, and simple lack of good manners", such as co-workers misloading and placing garbage in plaintiff's work trailer was the type of trivial harm that "will not deter victims of discrimination from complaining to the EEOC").

The Court does not, however, view these actions in isolation. As the Supreme Court instructed in *White,* the Court must be mindful that when reviewing retaliation claims, "[c]ontext matters." *White,* 548 U.S. at 69, 126 S.Ct. 2405. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). As a result, a reviewing legal standard that "speaks in general terms rather than specific prohibited acts is preferable, for an 'act that would be immaterial in some situations is material in others.'" *Id.* (quoting *Washington v. Ill. Dep't of Rev.,* 420 F.3d 658, 661 (7th Cir.2005)). In adopting this standard, the Court concluded that "[b]y focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts

---

2006. Therefore, Chumbley's observations necessarily occurred after Merfeld sent the

letter to the Warren County Attorney on May 9, 2006.

that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 69–70, 126 S.Ct. 2405.

With this standard in mind, the Court finds Merfeld has presented evidence that she was subjected to repeated instances of adverse treatment at the hands of her supervisors and that these acts were motivated by retaliation. For example, Miller and DeVault expressed their desire to make Merfeld's life miserable and force her to quit. DeVault testified that Merfeld came crying into her office several times, and, referring to Miller's treatment of her, saying she "couldn't take it anymore." Nonetheless, when Merfeld returned from maternity leave, DeVault relocated Merfeld's work station inside Miller's office and said that she knew Merfeld "would not like to sit" at a station in Miller's office, but thought it was the best place for Merfeld. DeVault said that in response to Merfeld's complaints, DeVault (1) addressed "the work issue, not the personal conflict," (2) did not consider Merfeld's complaints a grievance because they were not in writing, and (3) did not advise Merfeld to make a written grievance because "[Merfeld] signed the same personnel book that [the rest of us] did." Pl.'s App 34–37. For the reasons stated, genuine issues of material fact remain, and Defendants are not entitled to summary judgment on the retaliation claim.

### D. Negligent Disclosure of Personal Medical Information

Merfeld argues Defendants owed Merfeld a legal duty to use reasonable care not to disclose that Merfeld was pregnant, that she had activity or work restrictions because of her pregnancy, her medical diagnosis, her prior miscarriages, or any other personal medical information. Defendants

move for summary judgment, arguing Iowa does not recognize a cause of action for negligent disclosure of personal medical information.

Whether Defendants owed Merfeld a duty is a legal question for the Court. *See Stotts v. Eveleth,* 688 N.W.2d 803, 807 (Iowa 2004). The existence of a legal duty is determined by "(1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations." *Kolbe v. State,* 625 N.W.2d 721, 728 (Iowa 2001). "In the end, whether a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm." *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.,* 589 N.W.2d 256, 258 (Iowa 1999).

Merfeld concedes that no statute or administrative rule imposed a duty on Defendants not to disclose her medical information. Instead, Merfeld asserts Defendants owed her this duty based on her employment relationship with Defendants. Merfeld argues that because of that relationship, Defendants had access to her personal medical information, which they requested so as to determine Merfeld's ability to perform her duties in light of her doctor's restrictions. Merfeld asserts it is reasonable and appropriate for employers with access to this type of sensitive medical information to have a duty to use reasonable care to keep such information private. Merfeld further asserts "it is certainly foreseeable that an employee would be harmed by the disclosure of personal medical information she entrusted to her employer and, furthermore, it would discourage employees from sharing such information if employers have no duty to keep it confidential." Pl.'s Br. 20.

Defendants assert information such as an employee being pregnant is information often shared among employees, and there is little an employer can do to prevent such communications. Merfeld had restrictions imposed by her doctor that required a response from Defendants. To impose liability on an employer when, in the course of complying with an employee's work restrictions, the employee's medical condition becomes apparent, would be to impose an unfair and impossible burden on the employer. Whether this legal standard might be established on some set of facts, the record herein provides a wholly inadequate basis upon which to hold Defendants had a legal duty to Merfeld regarding the non-disclosure of her personal medical information, as a function of the employer/employee relation. Furthermore, the Court could not conclude Defendants acted unreasonably in disseminating the information to board members in the process of accommodating Merfeld's medical restrictions. Defendants are entitled to summary judgment and dismissal on this claim.

### E. Intentional Infliction of Emotional Distress Claim

■ The elements of the tort of intentional infliction of emotional distress are:

(1) Outrageous conduct by the defendant;

(2) The defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) Plaintiff has suffered severe or extreme emotional distress; and

(4) Actual proximate causation of the emotional distress by the defendant's outrageous conduct.

*Northrup v. Farmland Indus. Inc.*, 372 N.W.2d 193, 197 (Iowa 1985) (quoting *Vinson v. Linn–Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984)).

■ Merfeld alleges Defendants' outrageous conduct includes (1) her supervisors subjecting her to public discussion and ridicule concerning her pregnancy, prior miscarriage, and medical restrictions; (2) subjecting her to such onerous conditions that she quit her job; (3) a superior stating her intent to make Merfeld's life miserable; and (4) Defendants' conduct occurred at time, as Defendants were well aware, that Merfeld was (a) pregnant and contending with the complications of a pregnancy-related medical issue, or (b) caring for a premature baby.

■ In evaluating whether a party's conduct is outrageous, "the court should consider the relationship between the parties: 'The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.'" *Vinson v. Linn–Mar Comty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984) (quoting Restatement (Second) of Torts § 46). Even accepting Merfeld's allegations as true, the complained of conduct does not meet the legal standard for outrage. *See, e.g., Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F.Supp.2d 981, 1041–43 (S.D.Iowa 2006) (examining *Vinson* and cases applying the standard set forth therein, and concluding that even if the employer fired the plaintiff despite knowing the information supplied about the plaintiff was false and manufactured, employer's conduct was not sufficient to support a claim for intentional infliction of emotional distress).

■ As to the third element of the claim—the severe or extreme emotional distress suffered as a result of Defendants' conduct—Merfeld contends she was an "emotional basket case," she "cried every day," and she did not want to return to her job. There is no evidence Merfeld sought

counseling or took any medication for these symptoms. Accepting that Merfeld suffered these feelings of distress, they are nonetheless insufficiently severe or extreme to establish a prima facie case of intentional infliction of emotional distress. *See Barreca v. Nickolas,* 683 N.W.2d 111, 124 (Iowa 2004) (concluding that despite the plaintiff suffering "a great deal of humiliation, embarrassment, stress, and loss of sleep" due to the defendant's allegedly outrageous conduct, the plaintiff's claims did not amount to severe or extreme emotional distress); *Bates v. Allied Mut. Ins. Co.,* 467 N.W.2d 255, 261 (Iowa 1991) (concluding the plaintiff's feelings of anger that caused physical pain, sleepless nights, the haunting feeling he could have died in the car accident, and distressful feelings that occupied his waking moments, interrupted his sleep, and prevented him from enjoying life, fell "short of the necessary showing to establish a claim for intentional infliction of emotional distress"); *Poulsen v. Russell,* 300 N.W.2d 289, 297 (Iowa 1981) (concluding that although the plaintiff felt "super badly" and "very down," the plaintiff's symptoms were not enough to establish a prima facie case for severe distress). Thus, as Defendants contend, even if the Court were to find Defendants' conduct was outrageous, Merfeld has not made a sufficient showing that she suffered the requisite emotional distress. Defendants' motion for summary judgment on this claim is granted, and Merfeld's claim for intentional infliction of emotional distress is dismissed.

### F. Supplemental Jurisdiction

Because factual disputes preclude summary judgment on Merfeld's Title VII discrimination and retaliation claims, the Court finds Defendants' request to decline jurisdiction over Merfeld's remaining state law claims is moot.

## III. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (Clerk's No. 12) must be **denied in part and granted in part.** The motion is denied as to Counts I and V. The motion is granted as to Counts III and IV.

**IT IS SO ORDERED.**